# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: May 22, 2020

No. 11-577V

UNPUBLISHED

|  |  |
|---|---|
| D.G.,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Special Master Horner<br><br><br>Attorneys' Fees and Costs;<br>Protracted Case |

*Lisa A. Roquemore*, *Law Office of Lisa A. Roquemore, Rancho Santa Margarita, C.A., for Petitioner.*
*Debra A. Filteau Begley*, *United States Department of Justice, Washington, D.C., for Respondent.*

## <u>DECISION ON ATTORNEYS' FEES AND COSTS[1]</u>

On September 9, 2011, D.G. ("petitioner") filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program.[2] 42 U.S.C. §§ 300aa-10 to 34 (2012). Initially, the petition alleged that an influenza vaccine administered on August 23, 2009, caused D.G. to suffer muscle weakness, fatigue, dizziness, excessive sweating, seizures, fainting, vasovagal syncope, benign systolic murmur, positive ANA, multiple somatic complaints, anxiety, dystonia, neurocardiogenic syncope, and postural orthostatic tachycardia syndrome. (ECF No. 1.) However, shortly before the conclusion of the case, petitioner filed an amended petition narrowing her allegations to injuries of autoimmune autonomic neuropathy/dysautonomia, myasthenia gravis, and

---

[1] I intend to post this Ruling on the United States Court of Federal Claims' website. **This means the Ruling will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access. Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

autoimmunity to glutamate acid decarboxylase ("GAD").  (ECF No. 188.)  On May 24, 2019, the previously assigned special master issued her entitlement decision dismissing the petition – that decision also contains a description of the extensive procedural history of this matter. *D.G. v. Sec'y of Health & Human Servs.*, No. 11-577V, 2019 WL 2511769 (Fed. Cl. Spec. Mstr. May 24, 2019) (ECF No. 196).  On June 7, 2019, this case was reassigned to me.  (ECF No. 198.)

On November 6, 2019, petitioner filed an application for attorneys' fees and costs.  (ECF No. 203 ("Fees App.").)  Petitioner requests total attorneys' fees and costs in the amount of $634,742.89, which includes:

- $466,720.20 in attorneys' fees generated by her current counsel of record, Ms. Roquemore; and
- $99,667.43 in costs incurred by Ms. Roquemore (including $94,399.54 in expert costs from Dr. Steinman and $5,267.89 in additional litigation expenses); and
- $61,102.95 in attorneys' fees billed by her former counsel of record, Mr. Krakow; and
- $3,649.91 in costs incurred by Mr. Krakow; and
- $3,602.40 in litigation costs incurred by petitioner herself.

(Fees App. at 2.) [3]  Respondent responded to the motion on November 20, 2019, indicating that he "defers to the Court regarding whether the statutory requirements for an award of attorneys' fees and costs are met in this case" and, if so, requesting that I exercise my discretion to determine a reasonable award for attorneys' fees and costs. (Resp. at 2–3; ECF No. 205.)  Petitioner filed a reply on November 21, 2019, reiterating her belief that her request is reasonable.  (ECF No. 206.)

This matter is now ripe for consideration.  Petitioner previously received an award of interim attorneys' fees and costs in the amount of $44,961.65 on August 2, 2013, as well as an award of personal litigation expenses in the amount of $2,950.29 on July 1, 2014.  Accordingly, the entirety of the attorneys' fees and litigation costs ultimately sought in this case is $682,654.83.  For the reasons described below, however, I now award final attorneys' fees and costs in the reduced amount of $489,494.01.

## I.    Reasonable Attorneys' Fees and Costs

In unsuccessful cases such as this, the Vaccine Act permits an award of reasonable attorneys' fees and costs so long as the petition was brought in good faith

---

[3] In fact, in her motion, petitioner indicates her request is for $638,373.96, which includes $66,384.83 in fees and costs for petitioner's former counsel, Mr. Robert Krakow, and $96,399.54 in costs relating to Dr. Steinman's work.  However, the amounts cited in the motion for Mr. Krakow's fees and costs do not match the amounts listed on his invoices.  (*Compare* ECF No. 203, p. 2, and ECF No. 204-6, p. 15.) Additionally, in her reply, petitioner acknowledged that a $2,000.00 retainer for Dr. Steinman had already been reimbursed, reducing the total of Ms. Roquemore's requested costs as well.

and with a reasonable basis. § 15(e). Here, respondent has raised no argument that this case lacked either good faith or a reasonable basis. Moreover, upon my review, I conclude that these requirements are met. Accordingly, the primary question presented relates to the reasonableness of the amount sought for attorneys' fees and costs.

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347 (Fed. Cir. 2008). This is a two-step process. *Id.* at 1347-48. First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. *Id.* at 1348.

It is "well within the special master's discretion" to determine the reasonableness of fees. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521–22 (Fed. Cir. 1993); *see also Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991). ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Human Servs.*, 85 Fed. Cl. 313, 316–18 (2008).

Special masters can reduce a fee request *sua sponte*, without providing petitioners notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (2009). When determining the relevant fee reduction, special masters need not engage in a line-by-line analysis of petitioners' fee application. *Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (2011). Instead, they may rely on their experience with the Vaccine Program to determine the reasonable number of hours expended. *Wasson v. Sec'y of Dep't of Health & Human Servs.*, 24 Cl. Ct. 482, 484 (1991), *rev'd on other grounds and aff'd in relevant part*, 988 F.2d 131 (Fed. Cir. 1993). Just as "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests . . . Vaccine program special masters are also entitled to use their prior experience in reviewing fee applications." *Saxton*, 3 F.3d at 1521.

### a. Hourly Rates

Reasonable hourly rates are determined by looking at the "prevailing market rate" in the relevant community. *See Blum*, 465 U.S. at 894-95. The "prevailing market rate" is akin to the rate "in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895, n.11. Petitioners bear the burden of providing adequate evidence to prove that the requested hourly rate is reasonable. *Id.* The decision in *McCulloch v. Secretary of Health & Human Services* provided a framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. No. 09-293V, 2015 WL 5634323, at *19

(Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).  The Court has since updated the *McCulloch* rates, and the Attorneys' Forum Hourly Rate Fee Schedules for 2015–2016, 2017, 2018, and 2019 can be accessed online.[4]

Petitioner requests the following rates for the work of her counsel: for Ms. Lisa Roquemore, $355.00 per hour for work performed in 2012-2013, $365.00 per hour for work performed in 2014-2015, $400.00 per hour for work performed in 2016-2017, $409.00 per hour for work performed in 2018, and $421.00 per hour for work performed in 2019; for her paralegal work, $125.00 per hour for work performed in 2012-2015, $135.00 per hour for work performed in 2016, $138.00 per hour for work performed in 2018, and $139.00 per hour for work performed in 2019; for Mr. Robert Krakow, $375.00 per hour for work performed in 2012, $425.00 per hour for work performed in 2016, $435.00 per hour for work performed in 2017, and $464.00 per hour for work performed in 2019; and for his paralegal work, $125 for work performed in 2016, and $156 for work performed in 2019.  These rates are consistent with what Ms. Roquemore and Mr. Krakow have previously been awarded for their Vaccine Program work, and I find them to be reasonable.

### b.  Hours Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348.  Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).  "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016).  While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary.  *See O'Neill v. Sec'y of Health & Human Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015).  Clerical and secretarial tasks should not be billed at all, regardless of who performs them.  *See, e.g.*, *McCulloch*, 2015 WL 5634323, at *26.  Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate.  *See Scott v. Sec'y of Health & Human Servs.*, No. 08–756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases).  And "it is inappropriate for counsel to

---

[4] The 2015–2016 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule2015-2016.pdf.  The 2017 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2017.pdf.  The 2018 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf.  The 2019 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202019.pdf.  The hourly rates contained within the schedules are updated from the decision in *McCulloch*, 2015 WL 5634323.

bill time for educating themselves about basic aspects of the Vaccine Program."
*Matthews v. Sec'y of Health & Human Servs.*, No 14–1111V, 2016 WL 2853910, at *2
(Fed. Cl. Spec. Mstr. Apr. 18, 2016).

Upon review, the hours billed appear to be mostly appropriate. Ms. Roquemore
in particular has taken great care in providing detailed descriptions of the work
performed. Specific reduction necessary is for a relatively small amount of time
expended for administrative tasks, such as printing and scanning documents,
downloading online filings, and hole punching and bates stamping exhibits. There were
also a small number of billing entries throughout the case which I find should not be
reimbursed, such as time spent by Ms. Roquemore researching my background upon
the case being reassigned to me. I also note that Ms. Roquemore billed her full hourly
rate for time spent traveling, even the time which she delineated as not performing case
work. (Fees App. Ex. 2, pp. 139-40.) The total of the billing entries which I have found
to be facially inappropriate is $6,136.40. Accordingly, this reduces Ms. Roquemore's
fees from $466,720.20 to $460,583.80.

Turning next to work performed by Mr. Krakow, I likewise find his billing to be
largely appropriate in terms of the type of tasks documented. The only specific
reduction necessary is for travel time billed at his full hourly rate traveling back to New
York after the entitlement hearing. (Fees App. Ex. 15, p. 11.) This results in a reduction
of $1,381.25, reducing his fees from $61,102.95 to $59,721.70.

Simply culling specific objectionable billing entries, however, does not speak to
the broader question of whether all or most of the work performed in this case was
reasonably undertaken. The total amount requested – well over half a million dollars –
might itself suggest that a further downward adjustment should be viewed as
appropriate. At a glance, the amount of attorneys' fees and costs generated in this
unsuccessful claim seems surprising. Requests for attorneys' fees and costs of this
magnitude are relatively rare. Moreover, when such awards are requested, they
typically see very substantial reductions due to excessive hours billed and significant
billing deficiencies. *See, e.g.*, *R.K. v. Sec'y of Health & Human Servs.*, 760 Fed. Appx.
1010 (Fed. Cir. 2019) (noting petitioners requested fees and costs totaling $683,926.13
which was reduced by the special master to $225, 702.10.); *Raymo,* 129 Fed. Cl. at 691
(noting petitioners requested fees and costs of $731, 251.40 which was reduced by the
special master to $354,809.31.).

Ultimately, it is "well within the Special Master's discretion to reduce the hours to
a number that, in his experience and judgment, [is] reasonable for the work done."
*Saxton*, 3 F.3d at 1522; *see also Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl.
403, 406 (1997) (noting that "[t]he special master reduced the number of hours based
on a comparison of the length and complexity of this case with other Vaccine Program
precedent. This was appropriate."). In exercising that discretion, special masters may
reduce the number of hours submitted by a percentage of the amount charged so long
as a "concise but clear" justification for the reduction is provided. *Abbott v. Sec'y of*

*Health & Human Servs.*, 135 Fed. Cl. 107,111 (2017).  Special masters need not explain how many hours are appropriate.[5]  *Raymo*, 129 Fed. Cl. at 702.

In this case, I am especially struck by the fact that, despite a protracted history with what Special Master Millman ultimately characterized as "perplexing" twists and turns petitioner's expert presentation (ECF No. 196, p. 233), respondent's report filed in this case on March 13, 2013, as well as Special Master Millman's first substantive orders in the case issued March of 2015, accurately identified and predicted the central theme of the dismissal decision ultimately rendered *four years later* on May 24, 2019. That is, as early as 2013 and before petitioner filed any of Dr. Steinman's ten expert reports written for this case, respondent had asserted that petitioner's medical records did not provide preponderant evidence of an autonomic dysfunction that would explain her constellation of symptoms and further that the medical records strongly suggested a psychogenic etiology.  (ECF No. 42, p. 29.)  After this case was reassigned to Special Master Millman, she held two status conferences in late February and March of 2015 in which she explained that the medical records are not clear in establishing any autonomic condition and further suggested that Dr. Steinman's earlier reports (by that time he had filed three and ultimately filed ten) were not adequately linking his opinion to petitioner's symptom presentation.  (ECF Nos. 98, 100.)  In the March 27, 2015 status conference, just over two years after the filing of his Rule 4 report, respondent was still requesting clarification of the diagnosis petitioner was alleging.  (ECF No. 100.)  This strongly suggests that, even if the majority of tasks were billed facially appropriately when viewed in isolation, the case need not have generated the high fees and costs that it has over the lengthy period is was litigated.[6]

---

[5] The Court of Federal Claims has indicated that percentage reductions made for overbilling are subject to heightened scrutiny and must explain how a percentage reduction is quantified to arrive at a reasonable number of hours billed.  *Guerrero v. Sec'y of Health & Human Servs.*, 120 Fed. Cl. 474, 481 (2015). However, the lodestar analysis also allows for an upward or downward departure based on specific fact finding once a reasonable number of hours has already been determined. *Avera*, 515 F.3d at 1349 (citing *Blum*, 465 U.S. at 888).  In *Blum*, the Supreme Court explained that "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high."  465 U.S. at 888.  Such adjustments are rare; however, one special master has previously made downward adjustments due to poor attorney conduct ranging from 10-75%, including relative to lack of expert oversight.  *Masias v. Sec'y of Health & Human Servs.*, No. 99-697V, 2010 WL 1783542 (Fed. Cl. Spec. Mstr. Apr. 14, 2010) (adjusting reasonable attorneys' fees downward by 10% due to poor quality of advocacy); *Loving v. Sec'y of Health & Human Servs.*, No. 02-469V, 2016 WL 4098722 (Fed. Cl. Spec. Mstr. July 7, 2016) (awarding only 25% of fees requested due to counsel's failure to monitor his expert's billing practices and inaction in resolving the resulting fee dispute).  That same special master has rejected proportionality as a basis for making such a downward adjustment pursuant to the second step of the lodestar analysis.  *Masias*, 2013 WL 658439.

[6] In her application for fees and costs, petitioner's counsel provides a year by year description of the attorneys' fees generated in this case.  (*See* Fees App. at 19-27.)  Review of this chronology helps to further illustrate the point with a specific example.  Describing the work necessary in 2015, petitioner's counsel explains: "In early January, we received Respondent's expert reports including a new Respondent expert, Dr. Lancaster, who raised the issue, for the first time, of conversion disorder . . . Research and review of literature occurred of how various diseases such as myasthenia gravis can look like a conversion disorder but are not. Further research commenced regarding the alleged conversion disorder." (*Id.* at 21.)  First, this passage seemingly suggests that the presence of a conversation order did not become an issue in the case until 2015, requiring an unexpected responsive effort by petitioner.

Special Master Millman's extensive discussion in her dismissal decision of the many short-comings of petitioner's expert's opinion, and her discussion of the ways in which the scope of his opinion was substantially narrowed by thorough cross examination despite his numerous prior reports, further underscores the degree to which this case's protracted procedural history of seven and a half years did not aid in the resolution of the case.[7]  Moreover, despite petitioner's own complicated and lengthy medical history, the conditions that were ultimately at issue in this case – i.e. autoimmune autonomic neuropathy and vagus nerve damage vs. conversion disorder as resolved by the dismissal decision – are not inordinately complex by the standards of this program.  Accordingly, better case management by petitioner's counsel (including management of her expert) and higher quality analysis by Dr. Steinman very likely would have (and should have) resulted in a much more efficient outcome with a more reasonable number of hours expended.  A further reduction is therefore appropriate beyond those identified above relative to specific, facially objectionable, billing entries.

_____

However, the suspicion of a conversion disorder was raised by petitioner's own treating physicians in 2009 and was evidenced in the available medical records well before this case was even filed.  (Ex. 9, pp. 4-5.)  Moreover, respondent specifically discussed those medical records in his Rule 4 report (ECF No. 42, p. 7) in 2013 and also expressed at that time his own view that petitioner's condition was psychogenic.  Accordingly, even without Dr. Lancaster's later-introduced report, it should have been evident to petitioner, her counsel, and her expert, that the question of a psychogenic etiology generally and a conversion disorder specifically would need to be addressed in any successful litigation of this claim.  Yet, neither was discussed in any of Dr. Steinman's first three reports.  (Exs. 65, 92, 108.)  Moreover, as noted in this passage, petitioner's response to Dr. Lancaster's report was to research myasthenia gravis as an alternate explanation for symptoms consistent with a conversion disorder.  And, indeed, Dr. Steinman's fourth report, responding to Dr. Lancaster and filed June 1, 2015, specifically raised this point.  (Ex. 118, p. 17.)  Yet, Special Master Millman explained in her dismissal decision that during the hearing Dr. Steinman later "distanced himself" from any diagnosis of myasthenia gravis and, actually "abandoned" the diagnosis, testifying that it was not his "favorite" diagnosis.  (ECF No. 196, n.132, 138.)  Thus, petitioner's conversion disorder, which was evidenced in her pre-filing medical records, central to resolution of the case, and which Special Master Millman ultimately found to explain her symptoms by preponderant evidence, was not even addressed by petitioner until *almost four years* into the pendency of this claim.  And even then it was dismissed by Dr. Steinman at least in part based on an alternative diagnosis (myasthenia gravis) that he later disfavored.  Yet, Ms. Roquemore recounts that during the early years of litigation she had already incurred $111,518.13 in attorneys' fees and costs from 2012 through 2014.  (Fees App. at 19-21.)  This on top of $44,961.65 awarded to Mr. Krakow in August of 2013 when he was replaced as counsel of record.  All of this suggests that much of the significant amount of work poured into this case over years was in service of over-litigating those aspects of the case favored by petitioner without fully grappling with the complete underlying medical facts of the case, resulting, on the whole, in unreasonably incurred attorneys' fees.

[7] Notably, Special Master Millman suggested in her dismissal decision that Dr. Steinman's opinion throughout the case experienced perplexing "twists and turns" and that during the hearing he suggested this was due to a lack of focus.  (ECF No. 196, p. 233.)  Special Master Millman also noted that several of Dr. Steinman's reports were "erroneous," because in developing his reports he examined molecular mimicry relative to the vaccine formulation for the wrong flu season.  (*Id.* at 231-32.)  Particularly germane to this application or fees and costs, Special Master Millman specifically included in her decision the following admonishment of Dr. Steinman: "To make respondent, both counsel, and the undersigned careen along the many tracks of his various positions, all of which Dr. Steinman forcefully held until he changed his mind, is unacceptable and lessens any credibility he may have had because of his impressive CV."  (*Id.* at 234.)

Nonetheless, I note that there are also some factors suggesting that such a reduction should not be severe.  First, it should be noted that due to the fact that this case was not reassigned to me until after Special Master Millman's decision dismissing it was issued, I do not have first-hand knowledge of Ms. Roquemore's, Mr. Krakow's, or Dr. Steinman's performance.  Additionally, upon review of the particulars of this case, including the billing records, docket, substantive filings, and Special Master Millman's decision, I cannot say that the high fees generated in this case are *solely* due to petitioner's counsel's initiative or performance.  Indeed, upon my review, it appears that the three previously-assigned special masters were active in instructing additional litigation steps throughout the pendency of the case.  Nor, as the analysis above suggests, did I find any egregious lapses in billing judgment in counsel's billing records on the scale of those present in prior cases such as *R.K.* and *Raymo*.

Moreover, this case involved an extensive medical history and, significantly, a large amount of video footage of petitioner's alleged symptoms.  Review of such material would be necessarily time consuming.  Additionally, there were clearly circumstances in this case, such as petitioner's medical emergency during the entitlement hearing and subsequent follow up, that were beyond counsel's control.  Also significant, though not controlling, is the fact that respondent has opted not to object to the amount of attorneys' fees and costs incurred in this case.  Despite the large award requested, respondent has raised no challenge to the amount of attorneys' fees and costs in this case and instead deferred to my discretion to resolve the question of what constitutes reasonable fees for this case.[8]

---

[8] I do note that respondent indicates that he "no longer has sufficient resources to provide detailed objections to requests for attorneys' fees and costs."  (ECF No. 205, n.3.)  And, to be sure, this type of response is not isolated to this case nor tailored to the facts of this case.  The significance of respondent's stance on his participation in the award of attorneys' fees has been litigated.  Respondent does not waive his rights by issuing a boilerplate response.  Nor does respondent's failure to raise objections relieve the special master of exercising his or her discretion.  *McIntosh v. Sec'y of Health & Human Servs.*, 139 Fed. Cl. 238 (2018); *Dominguez v. Sec'y of Health & Human Servs.,* 136 Fed. Cl. 779 (2018); *Spahn v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 252 (2018).  However, respondent has also been put on notice by the Court of Federal Claims that, although the Vaccine Rules are silent as to respondent's role in awarding attorneys' fees and costs, in the Court's view "[t]he Department of Justice represents the Secretary of the Department of Health and Human Services in all parts of a Vaccine Act case, including petitions for entitlement to compensation and petitioners' counsels' requests for reasonable attorneys' fees and costs."  *McIntosh*, 129 Fed. Cl. at 252.  Thus, although respondent's failure to respond does not relieve the special master of his or her independent obligation to evaluate the reasonableness of attorneys' fees and costs, respondent's rationale for cordoning off attorneys' fees and costs as a distinct aspect of litigation susceptible to a wholesale lack of participation has been rejected.  Accordingly, each time respondent adopts his boilerplate response, though it is not a waiver, it does fairly represent a case-specific choice reflecting his prioritization of his resources against his responsibility to safeguard the trust fund.  I see no basis for assuming that respondent or his counsel would make such a choice irrationally (i.e. respondent is clearly aware that the potential award for attorneys' fees and costs in this case dwarfs the awards of damages in a significant portion of compensated cases).  Thus, I take notice of the fact that respondent, having had the opportunity to respond, has made a choice not to object in this instance to an outlay from the trust fund of approximately $630,000 to pay for the litigation in this specific case.  Because I am therefore exercising my discretion *sua sponte*, I choose in light of the facts and circumstances of this case to exercise it more reservedly than I may otherwise have if the reasonableness of the fees and costs were being actively litigated with specific objections at issue.

In balancing the above factors, I find that a discretionary 20% reduction in total attorneys' fees and expert costs is appropriate in this case due to unreasonable overlitigation. This further reduces Ms. Roquemore's fees from $460,583.80 to $368,467.04 and Mr. Krakow's fees from $59,721.70 to $47,777.36. Although the amount of the resulting award still remains high, petitioner's request is supported by detailed contemporaneous billing records, the protracted history of this case is not solely the fault of petitioner's counsel, and the overall amount requested is unchallenged.

### c. Attorneys' Costs

Like attorneys' fees, a request for reimbursement of attorneys' costs must be reasonable. *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992). For Ms. Roquemore, petitioner requests $99,667.43 in attorneys' costs. The majority of this amount, $94,399.54, is reimbursement for the work and expenses incurred from petitioner's expert, Dr. Lawrence Steinman.[9] (Fees App., p. 2.) The remainder represents general firm costs related to litigation such as postage and making photocopies, and for Ms. Roquemore's travel to Washington, DC to attend the entitlement hearing. (Fees App. Ex. 4.)

Concerning the work performed by Dr. Steinman, the invoices reflect 185.75 total hours billed at a rate of $500.00 per hour, a rate consistent with what Dr. Steinman typically receives for his Vaccine Program work. (Fees App. Ex. 9.) The large number of hours reflects the fact that Dr. Steinman produced five expert reports prior to the entitlement hearing, prepared for and testified in the entitlement hearing, and produced an additional five expert reports post-hearing. In light of the above discussion regarding the protracted history of this case, and especially in light of Dr. Steinman's own role in contributing to that protracted history (see especially *supra*, at n.5, 6), a 20% reduction consistent with the above is appropriate. This reduces Dr. Steinman's hourly billing from $92,875.00 to $74,300.00.

Additionally, Special Master Millman's dismissal decision is replete with criticism of Dr. Steinman's performance specific to this case. Special Master Millman explained that several of Dr. Steinman's reports were based on an erroneous assumption attributable to careless mistake and that he lacked focus for much of the case. (ECF No. 196, pp. 231-33.) She also indicated that Dr. Steinman "cherry-picked" evidence. (*Id.*) She also found substantial credibility problems relating to Dr. Steinman's evolving opinion in this case, describing him as "at war with himself, proposing diagnoses and then negating them, eventually ending up with pure speculation . . ." (*Id.* at 232.) In light of Special Master Millman's specific and significant criticisms going not just to Dr. Steinman's credibility, but also to his reliability due to a lack of care and attention particular to this case, a further 20% reduction in his fees is warranted. This further reduces Dr. Steinman's billing from $74,300.00 to $59,440.00.

---

[9] Dr. Steinman billed $92,875.00 for his hours worked and $3,524.54 for his expenses, which totals $96,399.54. As noted above, however, a $2,000.00 retainer was already reimbursed. (*See*, supra at n.3.)

Dr. Steinman's costs incurred for the entitlement hearing are reasonable, with the exception of $135.13 in travel costs which have not been supported with receipts or other documentation.  Accordingly, Dr. Steinman's reimbursable costs total $3,389.41.  Thus, the total reasonable amount for Dr. Steinman's work in this case is $62,829.41.  Less the previously-reimbursed retainer, petitioner should be reimbursed a remaining amount of $60,829.41 for Dr. Steinman's work.

Concerning the balance of Ms. Roquemore's costs, I find them to be reasonable except for the amount expended on food.  Ms. Roquemore averaged approximately $95.00 per day over four days on food, in excess of the GSA per diem of $69.00 per day for Washington, DC in fiscal year 2016.  I will therefore reduce the award of fees by $100.00 to account for the excessive food expenditures, leaving her remaining costs at $5,167.89.  In sum, Ms. Roquemore is awarded final attorneys' costs of $65,997.30.

Turning next to attorneys' costs for Mr. Krakow, petitioner requests a total of $3,649.91 for materials to prepare for the entitlement hearing and associated travel.  (Fees App., p. 2.)  Petitioner has supported all of these costs with adequate documentation, and they appear reasonable in my experience.  Mr. Krakow is therefore entitled to full reimbursement of his costs.

### d.  Petitioner's Costs

Pursuant to General Order No. 9, petitioner states that she has personally incurred costs of $3,602.40 related to this case.  (Fees App. Exs. 5, 6.)  This amount represents costs associated with traveling to the entitlement hearing to testify, such as airfare, hotel, and food, and for postage and acquisition of medical records.  Petitioner has supported her costs with adequate documentation, and they appear reasonable in my experience.  Petitioner is therefore awarded the full amount of costs requested.

## II.    Conclusion

In accordance with the Vaccine Act, 42 U.S.C. § 300aa-15(e) (2012), I have reviewed the billing records and costs in this case and finds that petitioner's request for fees and costs, other than the reductions delineated above, is reasonable.  **Accordingly, I award a total of $489,494.01 as follows:**

- **a lump sum in the amount of $434,464.34 representing reimbursement for petitioner's attorneys' fees and costs, in the form of a check payable to petitioner and her attorney, Ms. Lisa Roquemore;**

- **a lump sum in the amount of $51,427.27, representing reimbursement for petitioner's attorneys' fees and costs, in the form of a check payable to petitioner and her attorney, Mr. Robert Krakow; and**

- **a lump sum in the amount of $3,602.40, representing reimbursement for petitioner's costs, in the form of a check payable to petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court shall enter judgment in accordance herewith.[10]

**IT IS SO ORDERED.**

s/Daniel T. Horner
Daniel T. Horner
Special Master

---

[10] Entry of judgment can be expedited by each party's filing of a notice renouncing the right to seek review.  Vaccine Rule 11(a).